1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| FLOYD HILLS NELSON, | ) Case No. CV 11-5407-PSG (JPR) |
| Plaintiff, | ) |
| | ) |
| v. | ) REPORT AND RECOMMENDATION OF U.S. |
| | ) MAGISTRATE JUDGE |
| CITY OF LOS ANGELES et al., | ) |
| | ) |
| Defendants. | ) |

This Report and Recommendation is submitted to the Honorable Philip S. Gutierrez, U.S. District Judge, under 28 U.S.C. § 636 and General Order 05-07 of the U.S. District Court for the Central District of California.

**PROCEEDINGS**

Plaintiff and his former coplaintiff, Alonzo Harris,[1] filed this pro se civil-rights action on September 14, 2011, after being granted leave to proceed in forma pauperis. The original Complaint brought 10 causes of action against 39 Defendants.

---

[1] Harris, who is also known as Felton Bradford, was dismissed from the action on January 25, 2016, for failure to prosecute.

1

After three dismissals for failure to state a claim, the resolution of some of the causes of action, and the dismissal of several Defendants, Plaintiff filed the operative Third Amended Complaint on February 18, 2016.  On April 7, 2016, following multiple motions to dismiss, the Court granted Plaintiff leave to proceed on four claims in the TAC against Defendants Jeff Nolte, Gustavo Ramirez, Diana Herron, David Friedrich, and the City of Los Angeles, through its officials Charles Beck and William Bratton; Beck and Bratton were dismissed as individual Defendants.  The TAC's remaining claims arise from a July 11, 2008 officer-involved shooting of Plaintiff and Harris by members of the Los Angeles Police Department's Special Investigations Section.

On April 18, 2016, Defendants filed an Answer to the TAC. On April 21, 2017, after several discovery disputes, the Court ordered the parties to submit a proposed protective order and set final deadlines for the filing of discovery responses and any motion to compel.  On August 14, 2017, Plaintiff filed a motion to compel, which the Court rejected as untimely.  On August 28, 2017, Plaintiff filed a motion for reconsideration, and on October 16, he filed a "Motion for Continuance to Conduct Rule 56(d) Discovery."  The Court denied both motions on October 23, 2017.

On November 20, 2017, Defendants moved for summary judgment. On November 27, 2017, the Court ordered Plaintiff to file opposition and gave him notice of his obligations under Wyatt v. Terhune, 315 F.3d 1108, 1119, 1120 n.14 (9th Cir. 2003), and Woods v. Carey, 684 F.3d 934 (9th Cir. 2012), in opposing

Defendants' motion.  On January 5, 2018, Plaintiff filed
opposition and a request for judicial notice.  On January 9,
2018, Defendants moved to strike Plaintiff's opposition, in part
because he did not file a separate statement of genuine issues in
dispute.  On January 10, 2018, the Court denied Defendants'
motion to strike but in doing so stated, "Because Plaintiff did
not timely file a statement of genuine issues in dispute, he may
no longer do so."  On January 26, 2018, Plaintiff filed a "Notice
of Inaccuracy in Court Order Dated 1/10/2018," claiming that his
statement of genuine issues in dispute was contained within his
opposition brief.  Defendants filed a reply and objected to the
request for judicial notice on January 31, 2018.  Except as noted
herein, the Court has considered the entirety of Plaintiff's
filings in making this Report and Recommendation.

**SUMMARY-JUDGMENT STANDARDS**

     The Court must grant summary judgment if the papers "show[]
that there is no genuine dispute as to any material fact and the
movant is entitled to judgment as a matter of law."  Fed. R. Civ.
P. 56(a).  An issue is "genuine" only if a sufficient evidentiary
basis exists upon which a reasonable jury could find for the
nonmoving party.  Scott v. Harris, 550 U.S. 372, 380 (2007)
(citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48
(1986)).  A factual dispute is "material" only if it might affect
the outcome of the suit under governing law.  Anderson, 477 U.S.
at 248.

     The moving party bears the initial responsibility of
presenting the basis of its motion and identifying those portions
of the record it believes demonstrate, together with affidavits,

3

the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Once the moving party meets its initial burden, the burden shifts to the opposing party to demonstrate with specific facts, not mere conclusory allegations, the existence of a genuine issue of material fact.  Anderson, 477 U.S. at 247-48, 256; see Taylor v. List, 880 F.2d 1040, 1045 (9th Cir. 1989).  The opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts."  Scott, 550 U.S. at 380 (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986)).  It is not sufficient for the nonmoving party to "rest upon mere allegation or denials of his pleadings."  Anderson, 477 U.S. at 256; see also id. at 249 (noting that "in the face of the defendant's properly supported motion for summary judgment, the plaintiff could not rest on his allegations . . . to get to a jury without any significant probative evidence tending to support the complaint" (citation omitted)).  Thus, summary judgment is appropriate if the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Celotex, 477 U.S. at 322.

The Court's function is not to weigh the evidence or determine the truth of the matter but rather, after drawing all inferences in the light most favorable to the nonmoving party, to evaluate whether any genuine issue remains to be tried.  See Tolan v. Cotton, 134 S. Ct. 1861, 1866 (2014) (per curiam) (citing Anderson, 477 U.S. at 249); Bonivert v. City of Clarkston, 883 F.3d 865, 880 (9th Cir. 2018) (at summary-judgment

4

1  stage, court should not weigh "conflicting evidence with respect

2  to disputed material facts" (citation and alteration omitted)).

3  The Court may but is not required to consider materials in the

4  record not cited by the parties.  Fed. R. Civ. P. 56(c)(3).

5  **PLAINTIFF'S REQUEST FOR JUDICIAL NOTICE**

6  Plaintiff requests judicial notice of nearly 200 pages of

7  documents.  These include excerpts of Nolte's and Ramirez's

8  testimony at Plaintiff's criminal trial for attempted robbery and

9  records from or pertaining to previous legal proceedings

10  involving alleged excessive force by Nolte and Ramirez.  (See

11  generally Pl.'s Req. Jud. Notice, pt. 1, Ex. 1, Pt. 2, Exs. A,

12  B.)  They also include what appear to be copies of photographs of

13  the vehicles involved in the July 11, 2008 shooting and a diagram

14  showing their location at the time, as well as correspondence

15  from an attorney concerning information on Ramirez potentially

16  contained in LAPD files.  (See Pl.'s Req. Jud. Notice, pt. 2,

17  Exs. E, F, G, J (ECF No. 403-1).)

18  "The court may judicially notice a fact that is not subject

19  to reasonable dispute" because it "can be accurately and readily

20  determined from sources whose accuracy cannot reasonably be

21  questioned."  Fed. R. Evid. 201(b).  A request for judicial

22  notice must be granted "if a party requests it and the court is

23  supplied with the necessary information."  Id. R. 201(c)(2).  The

24  party who requests judicial notice has the burden of showing that

25  the information satisfies Rule 201.  Newman v. San Joaquin Delta

26  Cmty. Coll. Dist., 272 F.R.D. 505, 516 (E.D. Cal. 2011).

27  The Court may take judicial notice of and consider

28  "documents on file in federal or state courts."  Harris v. Cnty.

of Orange, 682 F.3d 1126, 1132 (9th Cir. 2012) (citation
omitted).  Facts that are irrelevant to the disposition of a
motion or appeal, however, need not be judicially noticed.  See
Kuba v. Sea World, Inc., 428 F. App'x 728, 732 (9th Cir. 2011)
(denying requests for judicial notice on appeal of grant of
summary judgment); Cox v. Princess Cruise Lines, Ltd., No.
CV-13-01765 RSWL (JEMx), 2015 WL 5031900, at *2 (C.D. Cal. Aug.
25, 2015) (denying plaintiff's request for judicial notice on
summary judgment because fact and content of materials not
relevant to determination of pending motion).

Plaintiff has not specified which facts from his voluminous
exhibits he wants the Court to judicially notice, much less how
they are relevant to the disposition of the summary-judgment
motion.  Defendants do not dispute the accuracy of the court
transcripts and decisions attached to Plaintiff's request.  (See
Reply at 2 (disputing only completeness and relevance).)  It
appears that his exhibits are intended to attack the credibility
of Nolte and Ramirez rather than to establish any particular fact
as undisputed or material.[2]  (See Opp'n at 17-21.)  Credibility
determinations are for the trier of fact.  See Tolan, 134 S. Ct.
at 1866 (citation omitted).

Plaintiff's motion for judicial notice of the court

---

[2]    For example, he indicates that Ramirez's testimony is
"purjured [sic]" (see Req. Jud. Notice, pt. 2 (ECF No. 403-1), at
14) but does not provide further information as to which statements
he contends are perjured, and no perjury is apparent to the Court.
Rather, the perjury allegation appears to arise from Ramirez's
having consistently attested to a version of events that differs
from Plaintiff's.  (See Ramirez Decl. ¶¶ 3-6; Req. Jud. Notice at
73-77 (5 Rep.'s Tr. at 883-87).)

transcripts and decisions should therefore be denied to the

extent it seeks a ruling on the officers' credibility.  Id.; see

also J. Line Pump Co. v. Shimmick Constr. Co., No. CV 11-9125 DMG

(AJWx), 2014 WL 12740309, at *1 n.3 (C.D. Cal. June 2, 2014) (on

motion for summary judgment, denying request for judicial notice

of documents from previous court case intended to impeach

defendant's credibility).  The Court should consider those

exhibits only to the extent they support his contention that

there remain genuine issues of disputed material fact as to the

circumstances of the shooting.[3]

With respect to the photos, diagram, and attorney

correspondence, Plaintiff has not cited any authority showing

that they are subject to judicial notice, and none is apparent to

the Court.  Nor has he supplied any foundation for introducing

them into evidence.  Defendants dispute their authenticity and

accuracy.  (See Reply at 2-3.)  "Authentication is a condition

precedent to admissibility" and is satisfied by "evidence

sufficient to support a finding that the matter in question is

what its proponent claims."  Orr v. Bank of Am., NT & SA, 285

F.3d 764, 773 (9th Cir. 2002) (as amended) (citation omitted).

On a motion for summary judgment, "documents authenticated

through personal knowledge must be attached to an affidavit," and

the affiant "must be a person through whom the exhibits could be

admitted into evidence."  Id. at 773-74 (citation omitted).

---

[3]   Plaintiff does not contend that the exhibits are relevant
to his municipal-liability claims.

Plaintiff has not made this showing.[4]  Accordingly, his request
for judicial notice of the photographs, diagram, and attorney
correspondence should be denied.  See Johnson v. Solano Cnty.
Sheriff's Dep't, No. 2:07cv2031 FCD-JFM-(PC), 2008 WL 3126253, at
*1 (E.D. Cal. Aug. 6, 2008) (denying plaintiff's request on
summary judgment for judicial notice of blurry and
unauthenticated copies of photographs).

### REMAINING CAUSES OF ACTION

Plaintiff's four remaining claims are as follows:

1.    Excessive force in violation of the Fourth Amendment
      against Defendants Nolte, Ramirez, and Herron.

2.    Failure to intervene in the use of excessive force
      against Defendants Friedrich and Herron.

3.    Ratification of the use of excessive force against the
      City through chiefs Beck and Bratton.

4.    Municipal liability for approval of punitive-damage
      awards and posting of appeal bonds in excessive-force
      cases against the City through its City Council and
      City Attorney's Office.

(See TAC at 5 ¶¶ a-f; Apr. 7, 2016 order at 30; Aug. 10, 2016
order at 2; Opp'n at 6.)

### SUMMARY OF MATERIAL FACTS

Except to the extent noted, the parties do not dispute the
following material facts, which are drawn from the TAC, the
evidence submitted with the parties' briefing on Defendants'

---

[4]    Plaintiff's opposition brief, which is not signed under
penalty of perjury, references his exhibits (see, e.g., Opp'n at
16-21) but his sworn Declaration does not.

motion for summary judgment, and the portions of Plaintiff's request for judicial notice as to which the Court has recommended taking notice.  Facts alleged in the TAC are cited only when necessary for context.  The Court has summarized Plaintiff's version of the facts only to the extent it is based on some actual evidence.  See In re Coordinated Pretrial Proceedings in Petroleum Prods. Antitrust Litig., 906 F.2d 432, 441 (9th Cir. 1990) (noting that at summary-judgment stage, court not required to adopt unreasonable inferences from circumstantial evidence); see also Burchett v. Bromps, 466 F. App'x 605, 606 (9th Cir. 2012) (conclusory evidentiary statements unsupported by factual data do not create triable issue of fact allowing party to survive summary judgment).

I.   The July 11, 2008 Officer-Involved Shooting

In June and July of 2008, the SIS conducted an approximately seven-week undercover surveillance operation that implicated Plaintiff and Harris in a string of robberies.  (Nolte Decl. ¶ 3; Herron Decl. ¶ 2; Friedrich Decl. ¶ 2; Pl.'s Dep. at 29:5-21.) Defendants Herron, Nolte, Ramirez, and Friedrich were SIS detectives who participated in the operation.  (Herron Decl. ¶ 2; Friedrich Decl. ¶ 2; Nolte Decl. ¶ 3; Ramirez Decl. ¶ 2; Pl.'s Decl. ¶¶ 2, 7.)  The SIS detectives knew that Harris had an extensive criminal history that included armed robbery, kidnapping, and assault with a deadly weapon, namely, a firearm. (Herron Decl. ¶ 2; Friedrich Decl. ¶ 2; Nolte Decl. ¶ 3; cf. Pl.'s Decl. ¶ 5; see also Pl.'s Opp'n at 3 ¶ 3 (conceding fact as undisputed).)  During the surveillance operation, SIS detectives had seen Harris and Plaintiff "casing" about 50 businesses to

rob. (Pl.'s Dep. at 28:21-29:12 & 31:2-7.) Plaintiff alleges that "at <u>NO TIME</u>" during the surveillance operation did SIS detectives "witness [him] involved in any violent conduct." (Pl.'s Decl. ¶ 7 (emphasis in original).)

On the morning of July 11, 2008, Plaintiff and Harris entered a closed Lawry's Prime Rib restaurant in Beverly Hills armed with guns. (Pl.'s Dep. at 36:8-37:14.) Plaintiff and Harris had masks on and had their hoodies up. (<u>Id.</u> at 37:1-8.) Plaintiff admits that he had previously used zip-ties to restrain people, and he and Harris tied up the chef at Lawry's that morning using such ties. (<u>Id.</u> at 30:14-17, 38:11-13, 39:1-42:15.)

The SIS Defendants and other detectives on the surveillance team were informed that Plaintiff and Harris had entered the Lawry's and had then been seen running back outside toward their vehicle. (Herron Decl. ¶ 3; Friedrich Decl. ¶ 3; Nolte Decl. ¶ 4; Ramirez Decl. ¶ 3; <u>see also</u> Opp'n at 3 ¶ 7 (conceding fact as undisputed).) Nondefendant SIS Detective Robert Kraus entered the restaurant and confirmed that Plaintiff and Harris had attempted to rob it and that both were armed with guns. (Herron Decl. ¶ 3; Friedrich Decl. ¶ 3; Nolte Decl. ¶ 4; Ramirez Decl. ¶ 3; Opp'n at 4 ¶ 8.) He communicated the information to the other detectives, possibly through radio transmissions to officers in a police helicopter. (Herron Decl. ¶ 3.) According to Plaintiff, when he and Harris left the restaurant, "LAPD Air-Support" saw him throw a black duffel bag containing his gun into the rear bed of his and Harris's Ford F-150 truck and "informed" the SIS detectives of that over "police audio two-way radio."

10

(Pl.'s Decl. ¶ 17.)[5]  Plaintiff and Harris were apparently not aware that they were being watched and drove away.  (Pl.'s Dep. at 31:18-20, 42:18-21.)

It was communicated to the SIS Defendants and other detectives that they should attempt to take Plaintiff and Harris into custody by using a "vehicle containment technique."  (Herron Decl. ¶ 4; Friedrich Decl. ¶ 4; Nolte Decl. ¶ 5; Ramirez Decl. ¶ 4; Opp'n at 4 ¶ 10.)  The VCT employs multiple police cars to block the suspect vehicle and prevent it from escaping.  (Id.)

At approximately 5:50 a.m., Harris and Plaintiff arrived at the intersection of San Vicente Boulevard and Fairfax Avenue. (Pl.'s Dep. at 42:18-24; TAC ¶ 26.)  SIS "Detective III" Charles Bennett, who was driving an unmarked 2007 Ford F-150 truck, stopped it just in front of Plaintiff's truck and "initiated the Vehicle Containment Technique (VCT) in conjunction/coordination" with Herron, Nolte, Ramirez, and Friedrich.  (TAC ¶ 26.)  Bennett "backed/rammed" his truck into the front of Plaintiff's "with sufficient force to jar Plaintiff and Harris inside."  (Id.; but see Pl.'s Dep. at 42:22-25 (implying that Plaintiff and Harris stopped their truck to look at a car for sale).)

Nolte was the driver and Ramirez the passenger in a second police vehicle, which was positioned behind the Plaintiff-Harris truck.  (Nolte Decl. ¶ 5; Ramirez Decl. ¶ 4.)  After Bennett's maneuver had stopped Plaintiff's truck, the Nolte-Ramirez vehicle "ram[med] the rear of [that] vehicle."  (TAC ¶ 26.)  Herron was

---

[5]   Plaintiff stated in his deposition that he and Harris "[d]eposited all the robbery tools inside the truck" and then got inside the truck themselves.  (Pl.'s Dep. at 42:17-18.)

the driver and Friedrich the passenger of a third police vehicle, which ended up "[a]pproximately 1'-3' away" from the Nolte-Ramirez truck and "parallel" to the rear of Plaintiff's F-150. (Herron Decl. ¶ 4; Friedrich Decl. ¶ 4; Opp'n at 4 ¶ 12; TAC ¶ 27 (alleging distances).)  Plaintiff was the passenger and Harris the driver of the Plaintiff-Harris truck.  (Nolte Decl. ¶ 6; Herron Decl. ¶ 4; Ramirez Decl. ¶ 5; Opp'n at 4 ¶ 20.)

The TAC alleges and Defendants evidently do not dispute that the officers were "attired in plain, nondiscriptive [sic] undercover civilian clothing."  (TAC ¶ 29.)  According to Defendants, they shouted commands, such as "[p]olice, hands up," but Plaintiff and Harris failed to comply.  (Herron Decl. ¶ 4; Friedrich Decl. ¶ 4; Nolte Decl. ¶ 5; Ramirez Decl. ¶ 5.)  In Plaintiff's account, the SIS Defendants did not initially identify themselves as police or shout any "commands to [him and Harris] that they failed to obey."  (Pl.'s Decl. ¶¶ 8-9, 15.)

Plaintiff did not know where Harris's gun was during the VCT and shooting and later found out that it was in Harris's waistband.  (Pl.'s Dep. at 49:22-25.)  He claims he did not have a gun during the encounter and that neither he nor Harris pointed a gun at anyone.  (Pl.'s Decl. ¶¶ 12-13, 16.)

Defendant Nolte observed Harris raise his hand holding a large blue-steel semi-automatic handgun pointed at Bennett. (Nolte Decl. ¶ 5.)  It is undisputed that Nolte yelled, "gun!" (Id.; Pl.'s Decl. ¶ 9.)  Nolte discharged "one or two rounds" from his shotgun in what he believed was defense of Bennett's life.  (Nolte Decl. ¶ 6.)  Plaintiff claims that Nolte "exited his vehicle, announced 'Gun' and immediately discharged his

1    firearm," either "simultaneously" or within one or two seconds.

2    (Pl.'s Decl. ¶¶ 3, 9; see also id. ¶ 15.)  According to Nolte,

3    Harris leaned toward the driver's-side door of the truck he was

4    in and began to turn his gun in the direction of Herron and

5    Friedrich.  (Nolte Decl. ¶ 6)  Nolte declares that he fired four

6    further rounds, which he claims were in defense of Herron's and

7    Friedrich's lives.  (Id.)  Nolte did not see Plaintiff holding a

8    gun.  (Id.)

9        Defendant Ramirez heard Nolte yell, "gun!" and saw Plaintiff

10   turn toward Nolte.  (Ramirez Decl. ¶ 5.)  He claims he saw

11   Plaintiff holding a gun.  (Id.)  He fired one round, which he

12   contends was in immediate defense of Nolte's life.  (Id.)  He did

13   not perceive any further threat and did not fire additional

14   rounds.  (Id.)

15       According to Plaintiff, Nolte and Ramirez fired shots

16   through the rear window of his truck "without cause or

17   provocation."  (Pl.'s Decl. ¶ 9; see also TAC ¶¶ 29, 34 (shots

18   that injured him came from Nolte and Ramirez's direction); Opp'n

19   at 29 (identifying Nolte and Ramirez as shooters).)  He claims

20   that Nolte and Ramirez could not have seen what they claim to

21   have seen because the rear window of his truck was "darkly

22   tinted" and in any event the rear headrests would have blocked

23   their view.  (Pl.'s Decl. ¶¶ 10-11, 13-15, 20.)

24       The TAC alleges and Defendants do not dispute that when

25   Herron and Friedrich heard Nolte yell "gun," they were between

26   five and 10 feet away from Plaintiff's truck and could see its

27   occupants through the "untinted/open" left windows.  (TAC ¶ 30;

28   Herron Decl. ¶ 4; Friedrich Decl. ¶ 4.)  Herron and Friedrich did

13

not see Plaintiff or Harris holding or pointing a gun during the encounter. (Id.) It is also undisputed that Herron was able to see Plaintiff and made eye contact with him. (Herron Decl. ¶ 4; Opp'n at 5 ¶ 26.) She heard Nolte yell, "gun!" and then heard two shots and saw glass breaking. (Herron Decl. ¶ 4; Opp'n at 5 ¶ 28.) She fired one round from her service pistol. (Herron Decl. ¶ 4; Opp'n at 5 ¶ 29.) Her weapon malfunctioned and she was unable to continue firing. (Id.) Herron believed that Plaintiff was shooting at her and Friedrich and returned fire in defense of their lives.[6] (Herron Decl. ¶ 4; Opp'n at 5 ¶ 28.) Once she had cleared the malfunction, she no longer perceived an imminent threat of death or serious bodily injury and did not fire additional rounds. (Herron Decl. ¶ 4; Opp'n at 5 ¶ 30.)

"At some point," Friedrich also heard Nolte yell, "gun!" and heard approximately three or four rounds being fired within a matter of seconds. (Friedrich Decl. ¶ 5; Opp'n at 5 ¶ 33.) Friedrich did not perceive a threat of death or serious bodily injury and did not discharge his weapon at all. (Friedrich Decl. ¶ 4.)

According to Plaintiff, there were two distinct volleys of gunfire separated by an interval of 30 to 60 seconds. (Pl.'s Decl. ¶¶ 15, 23; see TAC ¶ 34.) It is not clear what he or Harris was doing during the alleged 30- to 60-second interval. In Plaintiff's account, Defendants instructed him and Harris to

---

[6] Plaintiff initially appears to concede that Herron's belief was "reasonabl[e]" (see Opp'n at 5 ¶ 28) but later implies that he does not intend to abandon his excessive-force claim against Herron (see id. at 14-15).

raise their hands only after the first volley of gunfire. (Pl.'s Decl. ¶¶ 2, 23.)[7]  He complied and was shot "multiple times" while his hands were "raised and empty in the traditional position of surrender," apparently during the second volley. (Id. ¶¶ 2, 19, 23.)  It is not clear how Harris responded to the command to put his hands up.

According to Defendants, the entire shooting happened in a matter of "seconds," during which Harris or Plaintiff brandished a weapon or made furtive movements suggesting intent to shoot the officers or otherwise resist capture. (See, e.g., Nolte Decl. ¶¶ 5-6; Ramirez Decl. ¶ 5; Herron Decl. ¶¶ 4-5.)  Defendants appear to acknowledge that the encounter may have lasted up to 60 seconds, however.  (See Mot. Summ. J. at 11-12.)

It is not disputed that Plaintiff was "shot several times in the left wrist and forearm, causing . . . nerve damage and scarring."  (TAC ¶ 34.)  Although the record does not show which shots hit Plaintiff or who fired them, he appears to claim, and Defendants do not dispute, that his injury resulted from gunfire that came from Nolte and Ramirez's direction during the alleged second volley.  (Id.; see also Opp'n at 29 (identifying Nolte and Ramirez as shooters).)  Plaintiff claims that Defendants Herron and Friedrich did not attempt to intercede in or prevent Ramirez or Nolte from firing a second volley of gunfire even though they had an "unobstructed and clear" view of Plaintiff and Harris that showed neither was pointing a weapon at anyone (TAC ¶ 38) and

---

[7]  According to the TAC, that is also the point at which Defendants "identified themselves as police officers for the first time."  (TAC ¶ 33.)

they were in "constant audio two-way radio communications" with their colleagues during the encounter (Pl.'s Decl. ¶ 24).  Herron and Friedrich maintain that their view into the cab of the suspects' truck was limited and that they did not know and could not have known what Ramirez and Nolte could see from their perspectives.  (Herron Decl. ¶¶ 4-5; Friedrich Decl. ¶¶ 4-5.)

It is not disputed that after Harris surrendered and crawled out of the truck, Nolte saw a large blue-steel semi-automatic handgun protruding from the left side of Harris's waistband. (Nolte Decl. ¶ 6; Pl.'s Dep. at 49:21-25; Opp'n at 4 ¶ 19.) Plaintiff and Harris were taken into custody and subsequently convicted of attempted armed robbery.  (Herron Decl. ¶ 6; Friedrich Decl. ¶ 6; Nolte Decl. ¶ 7; Ramirez Decl. ¶ 6; Opp'n at 5 ¶ 35.)

II.  Municipal-Liability Allegations

The parties have not introduced evidence to support or dispute the following factual allegations, which are taken from the TAC.[8]

After the shooting, Harris filed a citizens' complaint against the SIS Defendants on his and Plaintiff's behalf.  (TAC ¶ 40.)  It was "determined to be unfounded."  (Id. ¶ 41.)  That determination was ratified by Beck and Bratton, who each served as Los Angeles chief of police at pertinent times.  (Id.)  The LAPD also conducted an internal investigation through its Field

_____

[8]  Plaintiff claims that he was unable to gather such evidence when the Court denied his August 2, 2017 motion to compel as untimely.  (See Opp'n at 30-31.)  The District Judge should also accept the analysis and conclusions in the undersigned's August 15 and October 23, 2017 orders concerning the motion to compel.

Investigation Division.  (Id. ¶ 42.)  The FID concluded that the force used against Plaintiff and Harris was "not excessive." (Id.)  Beck and Bratton ratified the FID's report and conclusions.  (Id. ¶ 43.)[9]

From 1992 to 2016, the LAPD received "hundreds" of citizens' complaints "monthly" alleging excessive force.  (Id. ¶ 44.) Those complaints were "seldom[,] if ever" determined to be "founded/legitimate" despite "overwhelming evidence in support of such a finding."  (Id.; see also id. ¶ 45.)  During that time, chiefs Beck and Bratton had a "common policy, practice[,] and/or custom" of "rubberstamp[ing] and ratify[ing] the conclusions" that citizens' complaints alleging excessive force were unfounded.  (Id. ¶ 46.)

Also from 1992 to 2016, the FID investigated "dozens" of officer-involved shootings "monthly."  (Id. ¶ 47.)  Of those investigations, the FID "seldom[,] if ever" determined that officers used excessive force, "in spite of overwhelming evidence in support of such a finding."  (Id.)  The FID had a "common policy, practice[,] and/or custom" of finding allegations of excessive force to be unfounded.  (Id. ¶ 48.)  Chiefs Beck and Bratton had a "common policy, practice[,] and/or custom" of "rubberstamp[ing] and ratify[ing]" the FID's conclusions.  (Id. ¶ 49.)

During the same 24-year period, the Los Angeles City

---

[9]   Beck was appointed as the LAPD's Chief of Police in November 2009.  Bratton was LAPD Chief of Police at the time of the shooting.  The record does not indicate when the citizens' complaint or FID report was allegedly ratified.

1   Attorney's Office represented LAPD personnel in approximately
2   1500 excessive-force cases.  (Id. ¶ 50.)  The City Council
3   "adhered to and implemented a policy, custom[,] and/or practice
4   of voting to pay punitive damage awards" and post appeal bonds in
5   even the most extreme cases, in violation of California
6   Government Code section 825(b).  (Id. ¶¶ 50-57.)  More
7   specifically, the City Council "agreed to pay punitive damage
8   awards and/or post appeal bonds" in "approximately 98%" of cases
9   between 1992 and 2016.  (Id. ¶ 55.)  Some of those cases involved
10  "extreme" and malicious conduct by LAPD personnel, "which was not
11  in the best interest of the public."  (Id. ¶ 56.)

**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

12

13  I.   <u>Excessive Force</u>

14       A.   <u>Applicable law</u>

15       The Fourth Amendment "guarantees citizens the right to be
16  secure in their persons against unreasonable seizures." <u>Graham</u>
17  <u>v. Connor</u>, 490 U.S. 386, 394 (1989) (citation and alteration
18  omitted).  It protects free people from excessive force during an
19  arrest, investigatory stop, or other seizure.  <u>Id.</u> at 388, 394-
20  95; <u>see also</u> <u>Norse v. City of Santa Cruz</u>, 629 F.3d 966, 978 (9th
21  Cir. 2010) (en banc) (Fourth Amendment applies to excessive-force
22  claim arising in context of arrest).

23       Fourth Amendment claims of excessive force are analyzed
24  under an "objective reasonableness" standard.  <u>Graham</u>, 490 U.S.
25  at 396-99; <u>Gravelet-Blondin v. Shelton</u>, 728 F.3d 1086, 1090 (9th
26  Cir. 2013).  That inquiry "requires a careful balancing of the
27  nature and quality of the intrusion on the individual's Fourth
28  Amendment interests against the countervailing governmental

18

interests at stake." <u>Graham</u>, 490 U.S. at 396 (citation omitted); accord <u>Mattos v. Agarano</u>, 661 F.3d 433, 441 (9th Cir. 2011) (en banc).  Relevant factors include "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." <u>Graham</u>, 490 U.S. at 396; <u>accord</u> <u>Gonzalez v. City of Anaheim</u>, 747 F.3d 789, 793 (9th Cir. 2014) (en banc).  The immediacy of the threat posed by the suspect is the most important factor. <u>Mattos</u>, 661 F.3d at 441.  These factors are not exclusive, however, and a court must consider the totality of the circumstances.  <u>Id.</u>; <u>see also</u> <u>Graham</u>, 490 U.S. at 396 (reasonableness inquiry "requires careful attention to the facts and circumstances of each particular case").

A court must assess the reasonableness of a particular use of force "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight," and must consider that "police officers are often forced to make split-second judgments — in circumstances that are tense, uncertain, and rapidly evolving — about the amount of force that is necessary in a particular situation."  <u>Graham</u>, 490 U.S. at 396-97.  Because the analysis usually requires a careful balancing of disputed factual contentions, the Ninth Circuit has cautioned that summary judgment in excessive-force cases should be granted sparingly.  <u>See</u> <u>Hayes v. Cnty. of San Diego</u>, 736 F.3d 1223, 1236 (9th Cir. 2013) (citing cases).

B.  <u>Analysis</u>

1.  *Defendants Nolte and Ramirez*

It is undisputed that Plaintiff and Harris attempted to rob the Lawry's Prime Rib restaurant on the morning of July 11, 2008, tied up the chef with zip ties in the process of doing so, and each had a firearm; it is also undisputed that law enforcement knew all this before the shooting.  (<u>See</u> Pl.'s Dep. at 30:14-17 & 36:8-42:15; Herron Decl. ¶¶ 2-3, 6; Friedrich Decl. ¶¶ 2-3, 6; Ramirez Decl. ¶¶ 2-3, 6; Nolte Decl. ¶¶ 3-4, 7.)  The detectives also knew that Harris had a violent criminal history.  (<u>See</u> Nolte Decl. ¶ 3; <u>see also</u> Friedrich Decl. ¶ 2; Herron Decl. ¶ 2; Opp'n at 3 ¶ 3 (conceding fact as undisputed).)  Armed robbery is "without question a very serious crime."  <u>Johnson v. Cnty. of L.A.</u>, 340 F.3d 787, 793 (9th Cir. 2003).  Moreover, deadly force may be appropriate when "there is probable cause to believe that [a] suspect has committed a crime involving the infliction or threatened infliction of serious physical harm."  <u>Forrett v. Richardson</u>, 112 F.3d 416, 420 (9th Cir.) (citation omitted), <u>superseded by rule on other grounds as recognized by</u> <u>Chroma Lighting v. GTE Prods. Corp.</u>, 127 F.3d 1136, 1136 (9th Cir. 1997).

The parties do not dispute that the VCT successfully stopped Plaintiff's truck and that he did not attempt to flee once the stop had occurred.  Plaintiff maintains that he and Harris did not do anything to evade or resist arrest and complied with all the officers' commands (<u>see, e.g.</u>, Pl.'s Decl. ¶¶ 2, 8-9, 15; Opp'n at 23-24), but Defendants contend that one or both suspects failed to comply with commands, made furtive movements, attempted

20

to slouch into the front seat of the vehicle out of view of the officers, and pointed a gun or appeared to point a gun at Defendants or their colleague, Officer Bennett. (See Herron Decl. ¶ 4; Friedrich Decl. ¶ 4; Ramirez Decl. ¶ 5; Nolte Decl. ¶¶ 5-6.) Genuine issues of material fact therefore remain as to whether Plaintiff was "actively" attempting to resist or evade capture. See Graham, 490 U.S. at 396.

The parties' accounts also diverge as to the facts underlying the second and most important Graham factor, the immediacy of the threat. In assessing whether an officer could have reasonably believed that a suspect posed an immediate threat, thereby justifying the officer's use of a firearm, courts consider several factors, including whether the suspect was armed, the suspect's movements and gestures, his response to verbal orders, the number of shots fired and the span of time over which they were fired, and the consistency of different officers' accounts of the situation. See Glenn v. Wash. Cnty, 673 F.3d 864, 872-80 (9th Cir. 2011) (as amended); see also Robertson v. Cnty. of L.A., No. CV 16-02761-BRO (SKx), 2017 WL 5643179, at *8, *10-11 (C.D. Cal. Oct. 17, 2017) (citing cases) (denying summary judgment when evidence showed several volleys of shots fired, officers' accounts were inconsistent, and suspect may not have understood verbal warnings), appeal filed No. 18-55154 (9th Cir. Feb. 7, 2018). As recounted below, there remain disputes of material fact as to all of these factors.

Nolte contends that he saw Harris holding or pointing a gun. (See Nolte Decl. ¶¶ 5-6.) Ramirez declares that he saw Plaintiff holding a gun. (See Ramirez Decl. ¶ 5.) Herron remembers seeing

Plaintiff "reach[] across his body as if he were reaching for a gun." (See Herron Decl. ¶ 4.) According to Plaintiff, the officers knew or should have known that his firearm was in a black duffel bag in the rear outer cab of his and Harris's truck. (See Pl.'s Decl. ¶¶ 16-17, 24.) Plaintiff "did not have a weapon during this time period." (Id. ¶ 16.) There was, therefore, at most one firearm in the cab of the truck, making it "illogical" for both men to have been holding or aiming it. (Id. ¶ 18.) Harris's hands were on the steering wheel of the truck at all times during the encounter and he did not hold, point, or reach for a gun. (Id. ¶¶ 12-13.) Even if either suspect had a gun, Nolte and Ramirez could not have seen Plaintiff or Harris holding it because the rear window of the suspects' truck was darkly tinted and the rear headrests blocked Nolte's and Ramirez's view. (See, e.g., id. ¶¶ 10-11, 15.) Mere possession of a weapon generally does not create an immediate threat. Hayes, 736 F.3d at 1233.

Defendants contend that they identified themselves as police immediately after initiating the VCT and before any shots were fired. (See, e.g., Nolte Decl. ¶ 5; Ramirez Decl. ¶ 5.) They assert that the shooting happened in a matter of "seconds" as Harris or Plaintiff made movements suggesting intent to shoot the officers or otherwise resist capture. (See, e.g., Nolte Decl. ¶ 5; Ramirez Decl. ¶ 5; Herron Decl. ¶¶ 4-5.)

Plaintiff contends that he and Harris were not aware police were following them and did not immediately recognize Defendants as police officers because they were not in uniform and were in unmarked cars. (See, e.g., Pl.'s Dep. at 31:18-20; TAC ¶ 29;

22

Opp'n at 24.)  Defendant Nolte began shooting "without cause or
provocation," before the officers identified themselves as
members of law enforcement.  (See, e.g., Pl.'s Decl. ¶¶ 2-3, 9.)
As soon as Plaintiff and Harris became aware that Defendants were
police officers, apparently some 30 to 60 seconds later,
Plaintiff raised his empty hands and surrendered peacefully.[10]
(See, e.g., id. ¶¶ 2, 19, 23; see also Opp'n at 28.)  The
suspects did not fail to obey any commands before the shooting
started.  (See, e.g., Pl.'s Decl. ¶ 8; see also Opp'n at 7
¶ 14(a) & 23.)  Plaintiff was shot while raising his hands in
surrender, evidently during the second volley of gunfire.  (See,
e.g., Pl.'s Decl. ¶¶ 2, 23; see also Opp'n at 10 ¶ 23(b).)

        Defendants appear to acknowledge that the encounter may have
lasted up to 60 seconds.  (See Mot. Summ. J. at 11-12.)  They are
inconsistent among themselves as to how many shots were fired, by
whom, when, and why.  (Compare Herron Decl. ¶ 4 (Herron heard two
shots and fired one to defend herself and Friedrich from
Plaintiff), with Friedrich Decl. ¶¶ 4-5 (Friedrich heard
"approximately three to four" shots but did not himself perceive
any imminent threat), with Nolte Decl. ¶¶ 5-6 (Nolte fired "one

_____

        [10] Plaintiff's filings do not indicate what he or Harris was
doing between volleys of gunfire or exactly how or when Harris
surrendered.  Plaintiff contends that Harris had his "grip on the
steering wheel" when Defendants allegedly saw him holding a gun
(see Pl.'s Decl. ¶ 12), but his declaration does not disclose what
Harris was doing while Plaintiff attempted to surrender.  The TAC
alleges that Harris raised his empty hands in surrender at or
around the same time as Plaintiff.  (See TAC ¶¶ 30-34.)
Defendants' moving papers do not address that allegation.  The
parties do not dispute that Harris ultimately surrendered and
crawled out of the truck.  (See Nolte Decl. ¶ 6; Opp'n at 4 ¶ 19.)

or two rounds" to defend Bennett from Harris and "four" rounds to defend Friedrich and Herron from Harris), and Ramirez Decl. ¶ 5 (Ramirez fired one shot to defend Nolte from Plaintiff; no account of hearing any other rounds).)  Nolte's declaration in particular suggests that there were two separate volleys of gunfire.  (See Nolte Decl. ¶¶ 5-6.)  If indeed 30 to 60 seconds elapsed without Plaintiff or Harris attempting to resist arrest or flee and Plaintiff was then shot after raising his hands in surrender while Harris did nothing to defy or threaten the officers, no immediate threat existed and deadly force may not have been justified.  See Plumhoff v. Rickard, 134 S. Ct. 2012, 2022 (2014) (second round of shots unreasonable if initial round clearly ended threat or if plaintiff "had clearly given himself up"); Solis-Diaz v. Tompkins, 656 F. App'x 294, 297 (9th Cir. 2016) (denying summary judgment when officer continued to fire at armed suspect after suspect had attempted to surrender); Robertson, 2017 WL 5643179, at *8, *10-11.  Thus, because there remain genuine disputes of material fact as to some of the Graham factors, it is not clear as a matter of law that the shooting was not excessive force.

        2.  *Defendant Herron*

    The TAC alleges and Defendants evidently do not dispute that the shots that caused Plaintiff's injury came "from the rear of [his] vehicle from . . . Nolte and Ramirez" (see TAC ¶ 34; see also Opp'n at 29 (identifying Nolte and Ramirez as the shooters)), apparently during the second volley (see, e.g., Pl.'s Decl. ¶ 2 (Plaintiff shot "after the first volley of gunfire" with his empty hands raised in surrender); TAC ¶¶ 33-34 (shots

24

that hit Plaintiff came "[a]fter the first volley of gunfire"); see also Opp'n at 28 (Plaintiff's timeline)).  Plaintiff agrees that Herron discharged only one round, immediately after hearing Nolte yell, "gun!" and the sound of two shots and breaking glass. (See Herron Decl. ¶ 4; Opp'n at 5 ¶¶ 28-29.)  The facts he disputes from her declaration appear to concern only the duration of the entire encounter, not the reasonableness of her particular decision to shoot.  (See Pl.'s Decl. ¶ 23; see also Opp'n at 11 ¶ 27(a).)[11]  Indeed, he at one point appears to concede that her decision to shoot was reasonable under the circumstances.  (See Opp'n at 5 ¶ 28.)

Plaintiff has never claimed that Herron was behind his truck with Nolte and Ramirez when he was shot from their direction, and nothing in the record suggests that her single round hit him (or, for that matter, that it was fired while he raised his hands in surrender).  As noted, Plaintiff concedes that she fired during the first volley, not the second.  Accordingly, there is no evidence that Herron used excessive force, and even if she had, it could not have proximately caused Plaintiff's injuries.  She is therefore entitled to summary judgment on the excessive-force claim against her.[12]

---

[11]  Plaintiff's contention that he was not reaching for a gun because he had no gun to reach for (see Pl.'s Decl. ¶ 22) does not contradict Herron's declaration that she saw him "reach[] across his body as if he were reaching for a gun" (see Herron Decl. ¶ 4 (emphasis added)).  Herron did not see Plaintiff or Harris holding a gun.  (See id.)

[12]  Even if Herron had used excessive force, she would likely be entitled to qualified immunity.  See Foster v. City of Fresno, 392 F. Supp. 2d 1140, 1158 (E.D. Cal. 2005) (granting qualified

C. <u>Qualified immunity</u>

Defendants argue in the alternative that they are entitled to summary judgment on grounds of qualified immunity. (<u>See</u> Mot. Summ. J. at 9-11.) "[Q]ualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" <u>Pearson v. Callahan</u>, 555 U.S. 223, 231 (2009) (quoting <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 818 (1982)). Qualified immunity applies "regardless of whether the government official's error is a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact." <u>Id.</u> (citation omitted).

In addressing qualified immunity, a court must determine whether the facts alleged, taken in the light most favorable to the party asserting the injury, show that the defendant's conduct violated a constitutional or statutory right and whether that right was "clearly established." <u>Cmty. House, Inc. v. City of Boise</u>, 623 F.3d 945, 967 (9th Cir. 2010) (citing <u>Saucier v. Katz</u>, 533 U.S. 194, 201 (2001), <u>overruled in part by</u> <u>Pearson</u>, 555 U.S. at 236). Courts may "exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." <u>Id.</u>; <u>see also</u> <u>Pearson</u>, 555 U.S. at 236.

Unless the facts show a constitutional violation of a

immunity to officer who shot plaintiff suspected of armed robbery on mistaken belief that plaintiff was reaching for weapon); (<u>see also infra</u> Section I.C.).

26

clearly established right, the official is entitled to qualified immunity.  <u>See</u> <u>Cmty. House</u>, 623 F.3d at 967.  A right is "clearly established" when "any reasonable official in the defendant's shoes would have understood that he was violating it."  <u>Kisela v. Hughes</u>, 138 S. Ct. 1148, 1153 (2018) (per curiam) (citation omitted); <u>see also</u> <u>Saucier</u>, 533 U.S. at 202; <u>Dist. of Columbia v. Wesby</u>, 138 S. Ct. 577, 589 (2018) (citations omitted).  Clearly established law "should not be defined 'at a high level of generality'" but "must be 'particularized' to the facts of the case."  <u>White v. Pauly</u>, 137 S. Ct. 548, 552 (2017) (per curiam) (citations omitted).  "Precedent involving similar facts" may put an officer on "notice that a specific use of force is unlawful."  <u>Kisela</u>, 138 S. Ct. at 1153 (citation omitted).  Although "a case directly on point" is not required, "existing precedent must have placed the statutory or constitutional question beyond debate."  <u>Mullenix v. Luna</u>, 136 S. Ct. 305, 308 (2015) (per curiam) (citation omitted).  "Put simply, qualified immunity protects 'all but the plainly incompetent or those who knowingly violate the law.'"  <u>Id.</u> (citation omitted).

     As discussed above, there are disputed issues of material fact regarding whether Nolte and Ramirez violated Plaintiff's Fourth Amendment rights, including what each could see from his viewpoint, when the officers identified themselves as police, whether Plaintiff or Harris was holding or pointing a gun at anyone, whether they failed to comply with any commands, how many shots were fired, and how long the encounter lasted.  If, as Plaintiff contends, Nolte or Ramirez shot him while he and Harris were complying with all officers' instructions and he was raising

27

his empty hands in surrender, and if in fact 30 to 60 seconds had elapsed since Nolte yelled "gun" and there was no reason to perceive an imminent threat, Nolte and Ramirez are not entitled to qualified immunity.  See Galvan v. City of La Habra, No. SACV 12-2103 JGB (RNBx), 2014 WL 1370747, at *16, *18 (C.D. Cal. Apr. 8, 2014) (denying summary judgment on qualified immunity when plaintiff alleged that he was shot by arresting officer after putting his empty hands up).

The only evidence concerning Herron, on the other hand, shows that she fired her gun only once, during the first volley, and right after hearing Nolte yell "gun." (See Herron Decl. ¶ 4; Pl.'s Decl. ¶ 23 (Herron fired one round); see also Opp'n at 5 ¶¶ 26 & 28-29 (conceding facts as undisputed).)  She knew that Plaintiff and Harris had just committed an attempted armed robbery and that Harris had a violent past. (See Herron Decl. ¶¶ 2-3; Pl.'s Decl. ¶ 5 (acknowledging Harris's violent past); see also Opp'n at 3 ¶¶ 3 & 5-6, 4 ¶ 8.)  Under these circumstances, if the force she used was excessive, the constitutional violation was not clearly established.  See George v. Morris, 736 F.3d 829, 838 (9th Cir. 2013) (as amended) (when suspect is armed or "reasonably suspected of being armed," "furtive movement" or "harrowing gesture" may create "immediate threat"); Foster v. City of Fresno, 392 F. Supp. 2d 1140, 1158 (E.D. Cal. 2005) (officer who shot plaintiff suspected of armed robbery on mistaken belief that plaintiff was reaching for weapon entitled to qualified immunity); see also Thompson v. Rahr, 885 F.3d 582, 588-90 (9th Cir. 2018) (unarmed suspect had no clearly established right not to have gun pointed at him during felony

28

arrest when he was "within seconds of a firearm" and situation

was "tense, uncertain, and rapidly evolving" (citation omitted)).

Defendants Nolte and Ramirez's motion for summary judgment

should therefore be denied on the excessive-force claims.  See

Glenn, 673 F.3d at 870 & n.7 (citing cases) (reversing and

remanding grant of summary judgment on qualified immunity in

officer-involved shooting "for resolution after the material

factual disputes have been determined by the jury"); Solis-Diaz,

656 F. App'x at 297 (summary judgment on qualified immunity not

appropriate when there remained "unresolved issues of [material]

fact" as to reasonableness of officer's shooting armed suspect

after attempt to surrender).  Herron's motion for summary

judgment on the excessive-force claim should be granted, however.

II.  Failure to Intervene

A.  Legal standard

Police officers have a duty to intercede when their fellow

officers violate the constitutional rights of a suspect.

Cunningham v. Gates, 229 F.3d 1271, 1289-90 (9th Cir. 2000) (as

amended).  The passive defendant violates a constitutional right

that "is analytically the same as the right violated by the

person who strikes the blows." United States v. Koon, 34 F.3d

1416, 1447 n.25 (9th Cir. 1994), rev'd on other grounds, 518 U.S.

81 (1996).  But officers can be held liable for failing to

intercede only if they had a realistic opportunity to do so.

Cunningham, 229 F.3d at 1289-90 (defendants not present at

shooting did not have realistic opportunity to intervene); see

also Browning v. Pend Oreille Cnty. Sheriff's Dep't, 442 F. App'x

310, 312 (9th Cir. 2011) (responding officers who did not witness

29

arresting officer's use of force or have any opportunity to prevent it were not liable for failing to intervene).  Even when an officer is present, there is no realistic opportunity to intervene when a constitutional violation happens too quickly for him to prevent.  See Knapps v. City of Oakland, 647 F. Supp. 2d 1129, 1143, 1159-60 (N.D. Cal. 2009) (six seconds did not provide realistic opportunity to intercede).  An opportunity is "realistic" when it is "reasonable."  See Hudson v. Franco, No. CV 14-1247-JLS (KK), 2016 WL 2993959, at *6 (C.D. Cal. Jan. 27, 2016) (citing Cunningham, 229 F.3d at 1289) (denying summary judgment for officer who witnessed 30 seconds of alleged misconduct by colleague because he may have had "reasonable" opportunity to intervene), accepted by 2016 WL 2993948 (C.D. Cal. May 22, 2016); Alarcon v. Pinal Cnty. Jail, No. CV 14-00163-PHX-RCB (MHB), 2014 WL 1875162, at *3 (D. Ariz. May 9, 2014) (citations omitted) (requiring plaintiff to allege that defendants were present during colleagues' alleged misconduct and had "reasonable opportunity to intercede").[13]

B.  Analysis

As discussed above, material factual issues remain as to whether any underlying constitutional violation occurred, including how long the encounter lasted and how many shots were fired and when.  Nevertheless, Plaintiff has not shown that Herron or Friedrich had a reasonable opportunity to intervene.

---

[13]  It is not clear whether the term "reasonable" in this context refers to an objective or subjective standard.  Plaintiff's claims fail under either standard for the reasons discussed below.

At most, Herron and Friedrich had 30 to 60 seconds during which they could have alerted Nolte and Ramirez that they did not perceive any threat.  (<u>See, e.g.</u>, Opp'n at 28-29.)  But they could not have known what Ramirez and Nolte saw from their vantage point.  (<u>See</u> Herron Decl. ¶ 5; Friedrich Decl. ¶ 5.)

Moreover, Plaintiff has not adduced any evidence that Herron or Friedrich would or should have anticipated that Nolte or Ramirez was about to engage in an unprovoked second volley of gunfire or could have done anything to prevent it in the course of less than a minute.  Plaintiff's contention that the officers were "in constant audio two-way radio communications" (<u>see</u> Pl.'s Decl. ¶¶ 4, 24) and could therefore have discussed the whereabouts of the suspects' firearms among themselves is not supported by evidence and in any event is inherently implausible.  <u>See</u> <u>Burns v. City of Concord</u>, No. 14-cv-00535-LB, 2017 WL 5751407, at *11 (N.D. Cal. Nov. 28, 2017) ("summary judgment in favor of non-shooting officers may be appropriate if they were present during the shooting but did not know that the shooting officers were going to shoot and were not physically capable of preventing the shooting" (citing <u>Ting v. United States</u>, 927 F.2d 1504, 1511-12 (9th Cir. 1991) (summary judgment proper for nonshooting officers when colleague several feet away suddenly used excessive force and incident "transpired in a matter of seconds"))).  The entire encounter lasted a minute at most.  And Plaintiff concedes that the detectives knew that both he and Harris had had guns inside the Lawry's; he also acknowledges that his gun was inside a black duffel bag that he put in the back of the truck.  Thus, air support could not possibly have seen both

31

weapons or been able to advise the detectives on the ground where the guns were at all times with any certainty.  Nor could they have known whether there were additional guns stashed in the truck.

In any event, even if Herron and Friedrich could have intervened, they would nonetheless be entitled to qualified immunity.  See Fernandez v. Virgillo, 651 F. App'x 692, 693-94 (9th Cir. 2016) (upholding grant of summary judgment for officer who did not intercede during "period of seconds" in which colleague "re-escalated" situation and shot suspect because defendant lacked "realistic opportunity . . . to intercede in a meaningful way"); Burns, 2017 WL 5751407, at *11 (nonshooting officers entitled to qualified immunity for failing to intercede in "rapidly evolving situation" involving suspect believed to be armed); see also Kisela, 138 S. Ct. at 1151, 1154-55 (reversing denial of qualified immunity to shooting officer when "less than a minute" elapsed between initial encounter and firing of shots).

Defendants' motion for summary judgment should therefore be granted on the failure-to-intervene claims against Herron and Friedrich.  See Kisela, 138 S. Ct. at 1154-55; Fernandez, 651 F. App'x at 693-94.

III. Municipal Liability

A.   Ratification

Plaintiff seeks to impose municipal liability on the City based on the LAPD chief's "rubberstamp[ing]" the FID investigation report as well as the denial of his and Harris's citizens' complaint.  (See TAC ¶¶ 40-44, 49.)  He alleges that the LAPD had a policy of "rubberstamp[ing]" such decisions in

"hundreds" of cases over a 24-year period, even in the face of "overwhelming evidence to the contrary." (See id. ¶¶ 44-46, 49.)

Because no respondeat superior liability exists under 42 U.S.C. § 1983, a municipality is liable only for injuries that arise from an official policy or longstanding custom. Monell v. Dep't of Soc. Servs., 436 U.S. 658, 694 (1978); City of Canton v. Harris, 489 U.S. 378, 385 (1989).

The Ninth Circuit has "found municipal liability on the basis of ratification when the officials involved adopted and expressly approved of the acts of others who caused the constitutional violation." Trevino v. Gates, 99 F.3d 911, 920 (9th Cir. 1996); accord Sheehan v. City & Cnty. of S.F., 743 F.3d 1211, 1231 (9th Cir. 2014), rev'd in part on other grounds, 135 S. Ct. 1765 (2015). A single instance of ratification may give rise to municipal liability. See Christie v. Iopa, 176 F.3d 1231, 1238-40 (9th Cir. 1999). "To show ratification, a plaintiff must prove that the 'authorized policymakers approve[d] a subordinate's decision and the basis for it.'" Sheehan, 743 F.3d at 1231 (quoting Christie, 176 F.3d at 1239); accord Gillette v. Delmore, 979 F.2d 1342, 1346-47 (9th Cir. 1992) (per curiam).

Defendants' Statement of Uncontroverted Material Facts does not address the existence of any policy relevant to the resolution of FID investigations or citizens' complaints involving allegations of excessive force. The record contains no evidence of any other instances of ratification in an excessive-force FID investigation or citizens' complaint. Plaintiff concedes in his opposition that he is "unable to provide the

33

necessary documentary evidence" to support his claim, blaming
that fact on the Court's denial of a motion to compel as
untimely.  (See Opp'n at 30.)  It appears, however, that
following a meet-and-confer with Defendants he agreed to withdraw
several of his discovery requests on this issue and limit his
remaining requests for production to — at most — the years 2006
on.  (See Aug. 15, 2017 order at 18-19, 29-40 (Plaintiff's
rejected Aug. 2, 2017 motion to compel).)  Defendants contend
that they provided all responsive such documents.  (Id. at 29-
40.)  Thus, no evidence in the record supports the existence of a
longstanding LAPD policy, custom, or practice of improperly
ratifying internal investigations on excessive-force claims.

        To the extent Plaintiff seeks to base municipal liability on
the police chief's single instance of ratification in his case,
the record does not reveal that Beck or Bratton "adopted and
expressly approved of" the "unfounded" determinations or
Defendants' conduct itself.  See Trevino, 99 F.3d at 920.  Courts
have recognized Monell claims arising from ratification of an
internal police investigation when the ratification supports a
finding that the constitutional injury resulted from a
departmental custom or practice.  See Larez v. City of L.A., 946
F.2d 630, 646-47 (9th Cir. 1991) (as amended) (upholding jury
verdict on excessive-force claim against police chief in official
capacity when witness testimony and documentation showed pattern
of similar conduct, inadequacies in investigation, and failure to
discipline or reprimand officers involved).  A determination that
a particular use of force was justified, however, does not by
itself show ratification.  See Kanae v. Hodson, 294 F. Supp. 2d

1179, 1190-91 (D. Haw. 2003) (requiring "something more" than investigators' acceptance of officer's story over plaintiff's, such as "sham investigation" or "conduct so outrageous" that reasonable policymaker should have taken steps to remedy it).

Ratification is not meant to create liability after the fact but rather helps to "prov[e] a preexisting government policy, custom, or practice that proximately cause[d]" a plaintiff's constitutional deprivation. See German v. Roberts, No. C15-5237 BHS-DWC, 2017 WL 6547472, at *2-5 (W.D. Wash. Dec. 22, 2017) (citations omitted) (granting summary judgment for defendants on ratification claim arising from officer-involved shooting). That showing may be made when the ratifying policymaker states that the defendant's conduct was within department policy. See Rosales v. City of Chico, No. 2:14-02152 WBS CMK, 2015 WL 6167740, at *7-8 (E.D. Cal. Oct. 20, 2015) (denying summary judgment when police chief had declared that defendant officer's use of force was "in compliance with Department policy"). Evidence that the policymaker was "actually or constructively aware" of a history of officer misconduct may also suffice. See Chang v. Cnty. of Santa Clara, No. 5:15-cv-02502-RMW, 2016 WL 6162460, at *5-6 (N.D. Cal. Oct. 24, 2016) (granting summary judgment for defendant when plaintiff did not present evidence that ratifying official had requisite awareness at time of injury).

The TAC alleges only that the police chief — whoever it was at pertinent times — "ratified" the department's internal

findings, apparently by "rubberstamp[ing]" them.[14]   (See TAC
¶¶ 41, 43, 46, 49.)   No evidence shows the contents of the
citizens' complaint or the FID report, the conduct of the
investigations, the basis for the determination that Plaintiff's
claims were "unfounded," or the reasoning behind any police
chief's approval of either disposition.   Plaintiff's rejected
August 2, 2017 motion to compel attached what was apparently the
table of contents from the FID report (see Aug. 15, 2017 order at
43-50) but did not contain information as to how, when, why, or
by whom it was allegedly ratified.   And the table of contents
gives no hint as to the report's findings or conclusions.   (See
id.)   As discussed above, Plaintiff has adduced no evidence to
support his claims that the LAPD had a history of improperly
ratifying the results of internal investigations into officer-
involved shootings or any type of excessive-force allegation.
Plaintiff's admission in his opposition that he is "unable to
provide the necessary documentary evidence" appears to extend to
a theory of ratification based on a single instance.   (See Opp'n
at 30.)   He has not alleged that the investigation was inadequate
or that either police chief declared that the officers' conduct
complied with department policy.

Accordingly, Plaintiff has not raised any triable issue of
material fact as to a ratification theory of Monell liability.
See Kanae, 294 F. Supp. 2d at 1191; cf. Rosales, 2015 WL 6167740,
at *7-8.   The City's motion for summary judgment on this claim

---

[14]   Plaintiff does not explicitly allege that Beck or Bratton "rubberstamped" the FID report or the denial of his citizens' complaint.   (See TAC ¶¶ 40-49; Opp'n at 30.)

1  should therefore be granted.  See Anderson, 477 U.S. at 249;

2  Burchett, 466 F. App'x at 606.

3      B.    Indemnification

4      The TAC also alleges municipal liability based on the City

5  Council's indemnification of punitive-damage awards and posting

6  of appeal bonds in LAPD excessive-force cases.  (See TAC ¶¶ 50-

7  57.)  California Government Code section 825(b) gives public

8  entities the discretion to pay punitive-damage awards against an

9  employee or former employee upon a finding that the employee

10 conduct at issue was undertaken in the scope of employment and

11 "in good faith, without actual malice and in the apparent best

12 interests" of the entity and when payment "would be in the

13 [entity's] best interests."  Cal. Gov't Code § 825(b)(1)-(3).  To

14 succeed on his indemnification claim, Plaintiff must show that a

15 relevant City policy, custom, or practice of improper

16 indemnification existed and that it proximately caused his

17 injury, presumably by encouraging the use of excessive force.

18 See Navarro v. Block, 250 F.3d 729, 734 (9th Cir. 2001); Trevino,

19 99 F.3d at 917-19; see also Blumberg v. Gates, 144 F. Supp. 2d

20 1221, 1224-25 (C.D. Cal. 2001) (discussing required causal nexus

21 between "policy of indemnification" and "constitutional

22 violations by police officers").

23     The TAC alleges that the City voted to pay punitive-damage

24 awards in "approximately 98%" of the "1500 excessive use of force

25 cases" it voted on between 1992 and 2016.  (See TAC ¶¶ 50, 55.)

26 Some of those were "extreme cases/violations, none of which were

27 done in good faith compliance."  (See id. ¶ 51.)  Plaintiff cites

28 no source for either assertion.  Following a meet-and-confer with

37

Defendants, he apparently agreed to limit discovery on his indemnification claim to punitive-damage awards that the City Council voted on during the calendar years of 2007 and 2008.[15] (See Aug. 15, 2017 order at 19-20.)  Plaintiff concedes that he has not adduced any evidence of a policy of bad-faith indemnification (see Opp'n at 31), and none is apparent in the record.

The City has met its burden under Celotex, and Plaintiff's wholly unsubstantiated allegations of bad-faith indemnification in excessive-force cases are insufficient to overcome that showing.  See Anderson, 477 U.S. at 249; Burchett, 466 F. App'x at 606.  The City's motion for summary judgment should therefore be granted.  Anderson, 477 U.S. at 249; Burchett, 466 F. App'x at 606; see also Trevino, 99 F.3d at 920 (summary judgment on Monell claim appropriate when "there are no genuine issues of material fact" and plaintiff "failed to establish a prima facie case").

**RECOMMENDATION**

For all these reasons, IT IS RECOMMENDED that the District Judge accept this Report and Recommendation as well as the undersigned's August 15 and October 23, 2017 orders concerning Plaintiff's motion to compel, grant Defendants' motion for summary judgment on Plaintiff's failure-to-intervene and municipal-liability claims and his excessive-force claim against

---

[15]   Even had he not so agreed, any improper indemnification policy in place after July 11, 2008, when the shooting occurred, could not have proximately caused Plaintiff's injuries by encouraging the use of excessive force.

Defendant Herron, and deny the motion with respect to the
excessive-force claims against Defendants Nolte and Ramirez.


DATED: April 23, 2018

_____
JEAN ROSENBLUTH
U.S. MAGISTRATE JUDGE